UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ERIN STROHBEHN,

                                    Plaintiff,

                    v.                                    Case No. 16-cv-985

ACCESS GROUP, INC. AND
WELTMAN WEINBERG &
REIS CO. L.P.A.,

                                    Defendants.

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANT ACCESS
GROUPS INC.'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

        In an all-in attack on Ms. Strohbehn's case, Access Group asked the Court to enter

judgment in its favor.  However, Access Group cannot meet its burden of proof.  The statute of

limitations has run on any balances due, Access Group is liability for the acts of its agent, Ms.

Strohbehn has suffered compensable damages, Access Group's lack of state specific regulations

shows a high degree of recklessness, and Ms. Strohbehn has has met her burden under the

Wisconsin Consumer Act.

## ARGUMENT

I.      **THE STATUTE OF LIMITATIONS HAS RUN ON ANY BALANCE ALLEGED DUE AND
        OWING.**

**A.  The time of breach on a contract is an objective standard.**

        Access Group takes an *ipse dixit* approach on its arguments regarding the statute of

limitations, arguing in essence "We say that the accounts did not go into default until 2016,

therefore the accounts went into default in 2016." However, contractual default in Wisconsin is objective, not subjective, and it does not matter when Access Group discovered it. *See CLL Assoc. Ltd. Partnership v. Arrowhead Pac. Corp.*, 174 Wis. 2d 604, 609 (1993) ("In Wisconsin, a 90-year line of precedent holds that in an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs. <u>This is true whether or not the facts of the breach are known by the party having the right to the action</u>.") (internal citations and quotes omitted) (emphasis added); *County of Milwaukee v. Schmidt, Garden & Erikson*, 43 Wis. 2d 445, 455 (1969) ("Ignorance of his rights on the part of a person against whom the statute has begun to run will not suspend its operation. <u>He may discover his injury too late to take advantage of the appropriate remedy</u>. Such is one of the occasional hardships necessarily incident to a law arbitrarily making legal remedies contingent on mere lapse of time.") (emphasis added) (citing *Bank of Hartford County v. Waterman*, 26 Conn. 324, 330); *Ott v. Hood*, 152 Wis. 97, 100 (1913) ("A cause of action on contract, whether for damages or otherwise, commences to run from the time of the breach, <u>whether the facts are known to the party having the right</u> or not and if the latter, whether through ignorance, neglect, or mistake of such party or fraud of his adversary. <u>There is no exception</u>.") (emphasis added).

**B. If funds were owed after the April 2007 payment, breach occurred in May 2007.**

Pursuant to statute, "[w]hen the period within which an action may be commenced on a Wisconsin cause of action has expired, the right is extinguished as well as the remedy." Wis. Stat. § 893.05. Wisconsin decisions have acknowledged this specific position in many decisions. *See* e.g. *Klewer v. Cavalry Invs., LLC*, 2002 U.S. Dist. LEXIS 1778, *8 (W.D. Wis. Jan. 30, 2002) ("Wisconsin law … falls in the minority in its elimination of the right to a debt as well as available remedies."). The Seventh Circuit as recently as this year recognized the distinction

between the Wisconsin statute of limitations and other states in the Seventh Circuit. *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 684 (7th Cir. 2017).

By arguing Wisconsin law and Wisconsin statute of limitations, Access Group concedes that Wisconsin's statute of limitations governs this issue. It offers no other discussion on any other state's statute of limitations and should not be allowed to change paths on reply. Access Group skips any discussion about the contracts, because a review of the contracts enforces Plaintiff's position.

The three contracts at issue show that monthly payments were required from 2007 forward.[1] Plaintiff's Proposed Additional Material Facts ("PPAMF") ¶ 85. Once the repayment period began in 2007, Ms. Strohbehn was required to make either 1) consecutive monthly payments until all interest and principal were paid over 240 months or 2) minimum monthly payments of $50 (that might result in paying off the loan before the expiration of 240 months). *Id*. at ¶ 86. These facts cannot be validly disputed. There is no mention in the contracts that a payment will "advance" the due date if the payment is above the required monthly payment, *Id*. at ¶ 87, and Access Group has stipulated that no such contractual term exists. Dkt. 114 ¶ 25.

But yet Access Group believes an unambiguous contract it drafted is trumped and amended by internal policies. The best it can hope for is a ruling that the contract is ambiguous, because "when a contract is ambiguous and consequently is properly construed by use of extrinsic evidence, the contract's interpretation presents a question of fact for the jury." *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, P32 (2010). But here, the contract contains

---

[1] Plaintiff refers the Court to her moving brief on summary judgment for a fuller argument as to how the contracts themselves show that she was in breach in 2007 if there was an amount owed. Dkt. 88.

sufficient details to allow the Court to grant Plaintiff's Motion for Summary Judgment and avoid a jury trial on the issue of contractual interpretation.

Ms. Strohbehn, having established that the date of the last payment was April 2007 and that the contract called for a minimum monthly payment of $50, has now established that she would have been in contractual breach if indeed an amount was due and owing after she failed to make a payment in May 2007. Access Group's failure to provide any contractual language regarding "advancing the monthly payment" means that it cannot now rely on language not in the contracts. Since breach occurred in 2007, any right and remedy to seek an alleged balance from Ms. Strohbehn expired in 2013, six years after breach.

### C. Access Group does not point to any binding cases for its interpretation of Wisconsin's statute of limitations.

Access Group's reliance on *Herrell v. Chase Bank USA*, 218 F. Supp.3d 788 (E.D. Wis. 2016) is misplaced. It is not the holding of "the <u>courts</u> of this District" and it was not made "in <u>this</u> Court." Dkt. 101, p. 16 (emphasis added). The decision by Judge Griesbach is not binding on this Court. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987).

The *Herrell* decision involved historical information on credit entries and the statute of limitations. Judge Griesbach ruled that "a credit report is intended to include more than a person's current debt" and that other historical information is also included as "[a] reasonable lender might find useful to know."[2] *Herrell* at 792. While Ms. Strohbehn would have liked the entire tradeline deleted from her report, she asked that the tradeline reflect a zero balance. PPAMF ¶ 88. The current balance she disputed is not historical information, but is rather a current statement by Access Group that Ms. Strohbehn currently owed an amount. *Id.* ¶ 89. If

---

[2] Judge Griesbach engaged in the reading and interpretation of credit reports in the absence of outside expert reports or interpretation. That reading appears to to be part of his basis for the case –that the furnisher in Herrell was merely reporting old, historic information.

the statute of limitations had indeed passed, "the right is extinguished as well as the remedy." Wis. Stat. § 893.05. Access Group does not quote anything in the *Herrell* decision that states that a current balance can show an amount due and owing after the statute of limitations has run. Rather, *Herrell* stands for the proposition that, in the opinion of Judge Griesbach, <u>historical information</u> on the tradeline does not have to be deleted after the statute of limitations has run.

Ms. Strohbehn had credit reporting by Access Group that stated she currently owed a balance due. The dispute is not over the historic information on the report, but the fact that the credit reporting stated she <u>currently</u> owed money. If the statute of limitations had passed, she did not <u>currently</u> owe money. The statute had run on these debts. Access Group lost both its right and its remedy after the statute expired in 2013. Ms. Strohbehn asks the Court to grant her summary judgment motion on this issue, or at minimum to deny Access Group's motion and allow the jury to decide.

## II. ACCESS GROUP IS LIABLE FOR THE ACTS OF ITS AGENT, ACS.

Access Group has argued that it did not receive notice of a dispute from Ms. Strohbehn and cannot be liable for the actions of Xerox/ACS (hereinafter "ACS"). However, given the law on agency liability, Access Group is indeed liable for the actions of ACS.

### A. Case law supports agency liability in FCRA cases.

In general, "An agency relationship arises when one person, the principal, manifests an intention that another person, the agent, shall act on his behalf." *Select Creations v. Paliafito Am.*, 830 F. Supp. 1223, 1233 (E.D. Wis. 1993) (internal citations omitted). "Agency may be created either by an act of the parties, such as by a grant of actual or apparent authority or by ratification, or by operation of the law, namely estoppel." *Id.* (citing *Old Security Life Ins. v. Continental Illinois Nat. Bank*, 740 F.2d 1384, 1391 (7th Cir. 1984). ACS's agency authority

springs from the actual intent of the principal (Access Group) to act on its behalf in connection with credit reporting, as discussed *infra*. *Paulson v. Madison Newspapers, Inc.,* 274 Wis. 355, 80 N.W.2d 421, 424 (Wis. 1957); *Kohl v. F.J.A. Christiansen Roofing Co*., 95 Wis. 2d 27, 289 N.W.2d 329, 332 (Wis. App. 1980). In the context of the agent/principal relationship, the actions of ACS serve to bind the principal. *United States v. Harris*, 914 F.2d 927, 931 (7th Cir. 1990).

"Most of the courts that have considered the issue [of whether the FCRA supports a theory of vicarious liability], however, have concluded that vicarious liability is consistent with the FCRA." *Ellis v. Pa. Higher Educ. Assistance Agency*, 2008 U.S. Dist. LEXIS 80743, *9 (C.D. Cal. Sept. 23, 2008). *See* also *Smith v. Sears, Roebuck & Co.,* 276 F. Supp. 2d 603, 606 (S.D. Miss. 2003) (listing a compilation of cases). The Sixth Circuit addressed agency liability in the context of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, finding that first the express intent of the FCRA must be examined:

> **Because the FCRA does not directly address vicarious liability, we look to the statute's purposes for guidance in determining whether to interpret the FCRA's words to include liability based on the apparent authority of an employee. *See Wells v. United States Steel*, 76 F.3d 731, 737 (6th Cir. 1996); *EEOC v. Kimberly-Clark Corp*., 511 F.2d 1352, 1357 (6th Cir. 1975); 2A Singer, *Sutherland Statutes and Statutory Construction* § 45.09 at p.40 (4th ed. 1984). We are additionally guided by the fact that the FCRA is to be liberally construed in favor of the consumer, *see Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995), as well as the rule of statutory construction which requires us to read a statutory provision in a manner consistent with the statute's other provisions, *see, e.g., Saxion v. Titan-C-Mfg., Inc*., 86 F.3d 553, 560 (6th Cir. 1996).**
>
> **Congress articulated the FCRA's underlying purpose as to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this [Act].**

**15 U.S.C. § 1681(b).** Congress also made a finding in enacting the FCRA that "there is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." **15 U.S.C. § 1681(a)(4). Thus, the FCRA is aimed at protecting consumers from inaccurate information in consumer reports and at the establishment of credit reporting procedures that utilize correct, relevant, and up-to-date information in a confidential and responsible manner.** *See Pinner v. Schmidt***, 805 F.2d 1258, 1261 (5th Cir. 1986).**

*Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 964-965 (6th Cir. 1998) (emphasis in original). When applying the liberally construction in favor of the consumer to the FCRA, the court found that agency liability was a jury question:

> In the absence of specific language regarding the imposition of vicarious liability based on apparent authority, we must consider whether an apparent authority theory is consistent with Congress's intent behind the FCRA. Protecting consumers from the improper use of credit reports is an underlying policy of the FCRA…
>
> Failure to impose vicarious liability on a corporation like Federated would allow it to escape liability for "willful" or "negligent" violations of the statute. Because a company like Federated can act only through its agents, it is difficult to imagine a situation in which a company would ever be found to have willfully violated the statute directly by obtaining a credit report for an impermissible purpose. The FCRA's deterrence goal would be subverted if a corporation could escape liability for a violation that could only occur because the corporation cloaked its agent with the apparent authority to request credit reports.
>
> If the trier of fact finds that Federated created an appearance of authority that caused the credit reporting agency reasonably and prudently to believe that Caylor had made a proper request for a permissible purpose, and that there was reliance on Caylor's apparent authority, see *Restatement (Second) Agency* § 219(d)(2), at p. 481 (1958), then it may find Federated liable for negligent or willful violations of the FCRA.

*Id*. at 965-966.

While ignoring the actual evidence in this case, Access Groups relies on a *pro se* case from Indiana. *Cannon v. United Guar. Residential Ins. Co.*, No. 116CV00095RLYDKL, 2017 WL 819707 (S.D. Ind. Mar. 2, 2017). In *Cannon*, the plaintiff had no evidence to assert that the debt collector (as an agent) even reported wrong information and only argued "a conclusory

statement that United hired RAB to collect the debt and that United is responsible for RAB's actions." *Id*. at 11-12. But *Cannon* is not the record before the Court, and Ms. Strohbehn has sufficient evidence.[3] Having established that agency liability is a jury question, Ms. Strohbehn presents her evidence below, to show the Court that a reasonable jury, when viewing the facts in her favor, would return a verdict for her.

### B. A reasonable jury would find that ACS is Access Group's agent.

ACS owns a loan billing, record keeping, reporting and loan management system, PPAMF at ¶ 90, and Access Group hired ACS to <u>assist</u> it in managing a private student loan portfolio. *Id*. at ¶ 91. This symbiotic relationship is manifested by the fact that when loan information was furnished to Ms. Strohbehn's credit (and other consumer's credit), it physically appeared as an "ACS/Access" co-branded tradeline. *Id*. at ¶ 93.

The tandem nature of their relationship is evident in the division of simultaneous collection on delinquent accounts. If an account is 16 days past due, Access Group (not ACS) calls the consumer for payment. *Id*. at ¶ 94. If Access Group is unable to get a payment, then Access Group directs ACS to report the delinquency to a consumer's credit once the account is deemed 60+ days delinquent. *Id*. at ¶ 92. ACS places information into Access Group's system on a daily basis, *Id*. at ¶ 95, and Access Group can view and make notes in ACS's system. *Id*. at ¶ 96. During the servicing of the loans by ACS, Access Group communicated directly with Ms. Strohbehn about her loans. *Id*. at ¶ 97. Access Group agreed with how ACS was reporting the information to Plaintiff's credit file as the two companies worked in tandem to collect from Ms.

---

[3] Access Group makes only a skeletal argument on why it should not be deemed an agent under the FCRA, and this court need not accept Access Group's undeveloped analysis. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Furthermore, this court may not accept or consider new arguments of Access Group on reply. *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008). Access Group had an opportunity to agency liability, and it cannot argue something different on reply.

Strohbehn.  *Id*. at ¶ 98.  ACS used the "Access Group Private Loan Program Product Manual" for day-to-day operations on Ms. Strohbehn's loan, and Access Group agreed with the way Ms. Strohbehn's credit reporting was handled.  *Id*. at ¶ 99.  Furthermore, Access Groups required that ACS report the information (and the delinquencies) as part of the joint collection on the loan.  *Id*. at ¶ 100.  As evidenced by the stated purpose of the contract between them, ACS was merely "assisting" Access in the management of it's private education loan portfolio.  *Id*. at ¶ 90.  ACS receives its information on the loans from Access, *Id*. at ¶ 101.  In this case, ACS was reporting three separate co-branded tradelines on Ms. Strohbehn using the information that Access Group provided to ACS.  *Id*. at ¶ 102.

ACS reported three tradelines as delinquent to Ms. Strohbehn's credit, as part of its loan management services to Access Group.  *Id*. at ¶ 105.  ACS processed nine different credit disputes in connection with Ms. Strohbehn's Access Group loans.  *Id*. at ¶ 106.  When ACS responding to disputes from Ms. Strohbehn, it was relying solely on the payment history and record from Access Group, information that Access Group promised was reliable and accurate.  *Id*. at ¶ 103-104.  As a result, ACS responded to Ms. Strohbehn's disputes stating that she was not merely 60-89 days past due, but rather 90-119 days past due as for April, 2016, causing incorrect information to remain.  *Id*. at ¶¶ 107, 111.  Any changes that occurred to the credit reporting of Plaintiff was done by ACS according to the guidelines from Access Group.  *Id*. at ¶ 108.  If Access Group received a payment during a time when a loan was in a delinquent status, ACS would update credit reporting information.  *Id*. at ¶ 109.  Access Group had the ability to direct ACS's management of loans, and did so in connection with Ms. Strohbehn.  *Id*. at ¶ 110.

Access Group ignores the testimony and evidence, arguing *ipso facto* that since it did not personally report information on Plaintiff nor personally respond to Plaintiff's FCRA disputes, it

can never be held liable.  It tries to pass on blame to ACS. Such cursory and conclusive

arguments do not carry the day as it relates to combating Plaintiff's arguments on agency

liability, as the evidence in the record must be viewed in the light most favorable to Plaintiff.

The record, as a whole, shows that a rationale trial of fact could indeed find agency liability for

Ms. Strohbehn (the non-moving party). *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs.,*

*Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001).

While there many facts presented *supra* to support the proposition the agency liability

relationship of Access Group and ACS, Ms. Strohbehn will highlight three now: 1) the co-

branded information on Plaintiff's credit, 2) the basis for the accuracy of the information placed

on Plaintiff's credit, 3) the terms of the Access/ACS contract.

### i.    *Access Group's named appeared on Plaintiff's credit as a co-branded tradeline.*

ACS reported the Access Group accounts as "ACS/Access" on Ms. Strohbehn's credit.

As a result of this information, Ms. Strohbehn sent a dispute to the credit reporting agencies

referencing "ACS/Access."  Access Group shouldn't be allowed to pass the buck to ACS for the

credit reporting.  The loan balance was reported using Access Group's records and information,

and the very name of "Access" appeared in the actual information being sent to the credit

reporting agencies.  While ACS was reporting information, Ms. Strohbehn was also getting

collection calls from Access Group.

### ii.    *Access Group supplied all the information that was reported.*

During the time that ACS reported three separate entries to Ms. Strohbehn's credit, the

"balance" due remained the same from 2012 to 2016.  That balance due was the amount of

principal that Access Group told ACS to place on the credit of Plaintiff.  That amount was solely

based on the records and information from Access Group and was reported under its very name.

The disputes sent by Ms. Strohbehn were answered by ACS using information that Access Group had given to ACS. Access Group vouched for the accuracy of the information, agreeing to indemnify ACS if ACS was sued as a result of incorrect information from Access Group.

### iii. Access Group required ACS to report its loans to Plaintiff's credit.

ACS was hired to report information to Ms. Strohbehn's credit. That was its job and expressly delegated scope of their authority (among other administrative tasks) in connection with Plaintiff. Access Group knew that ACS would report derogatory information to Ms. Strohbehn's credit after it had remain unpaid for 60+ days. ACS did this for Access Group, and Access Group should be held responsible.

## C. Access Group is liable to Ms. Strohbehn under the FCRA.

As stated previously by this Court, "Plaintiff remains free to pursue Access for [ACS's] conduct, as she insists that [ACS] was at all times acting as Access's agent…" Dkt. 62, 68 ¶19, 23. There are two conditions precedent to Access Group having liability under the FCRA: 1) credit information being furnished as to Plaintiff, and 2) Plaintiff filing a "dispute." 15 U.S.C. §1681s(2)-(b). Both conditions precedent were met.

Since the FCRA is to be liberally construed in favor of the consumer, Ms. Strohbehn contends that to allow Access Group to skirt the FCRA by hiring someone else to publish its derogatory credit information and to respond to disputes based off of Access Group's records would not be in keeping with the purposes or goals of the FCRA. It would allow creditors, like Access Group, to dodge its duty to convey accurate and complete information about consumers by hiring another entity, while telling that entity what to report. As such, Access Group's arguments should be deemed unpersuasive. This is a jury question, and a reasonable jury could

find that ACS is the agent of Access Group, based on the record, along with the fact that Access Group has not disclaimed its agency relationship with ACS.

### III.   PLAINTIFF HAS ESTABLISHED ACTUAL DAMAGES AND CAUSATION UNDER THE FCRA.

While actual damages are not presumed, the hurdle for damages in a consumer case is not impossible. Ms. Strohbehn will show a 1) a causal connection between the false information and financial harm, 2) and reasonably detailed and sufficient evidence about her emotional distress.

### 1.   Causal connection between false information and financial harm.

Plaintiff has suffered a lower credit score, a loss of credit opportunity, and harm to existing credit. These types of actual harm fall squarely within the type and scope of harms that the FCRA was designed to redress. See 15 U.S.C. §1681(a). Ms. Strohbehn need not show that Access Group's conduct was the sole cause of her losses:

> The FCRA does not require the defendant's conduct to be the *sole* cause of losses, but merely an "actual" cause. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 969 (3d Cir. 1996) ("[c]ourts have recognized that where a decision-making process implicates a wide range of considerations, all of which factor into the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of proving that one of those factors was the cause of the decision." (emphasis in original)).

*Martinez v. Vericrest Fin.*, 2015 U.S. Dist. LEXIS 9148, *5-6, (E. D. Wis., January 26, 2015).

**Lower Credit Score:**

Access Group argues that Plaintiff herself must personally quantify the amount of her credit score decrease as a result of Access Group's reporting. But Plaintiff need not be the only fount of testimony in her case. Here, Mr. McConville has provided testimony that Access Group's information moved her credit score rating from "good" to "very poor." PPAMF ¶ 113. The testimony shows the causal connection between the false information of Access Group and

the impact on Ms. Strohbehn's credit score.  A jury could reasonably find that Plaintiff's lower credit score was caused by Access Group.  As such, Defendant's motion must be denied.

**Pre-suit denials:**

Ms. Strohbehn was informed that Access Group would place negative information on her credit report.  She filed FCRA disputes and received verification that the negative information would remain.  Access Group maintains that Ms. Strohbehn should then have procured credit denials before suing.  But if Plaintiff had taken such an action she would have been accused of either manufacturing damages or of failing to mitigate damages (because reasonable people do not apply for credit when they know they can't get it).  Mr. McConville has provided testimony regarding the fact that Ms. Strohbehn would have been rejected for credit or subjected to high subprime interest rates.  *Id*. at ¶ 112.  Plaintiff did not apply for credit because of Access Group's negative credit information.  *Id*. at ¶ 120-122.  This negative information, Plaintiff's statement regarding why she did not seek new credit, and Mr. McConville's testimony is sufficient evidence to establish Ms. Strohbehn's inability to procure financing.

The Eastern District of Oregon found these types of damages are sufficient:

Plaintiff asserts she did not apply for additional credit after these denials for fear that her new applications would be denied as well. She also contends her reputation has been damaged as a result of Equifax's actions.

Defendant, in turn, argues Plaintiff was unable to identify any specific lost credit opportunities and, in any event, any purported damage to her reputation is speculative.

The Court disagrees that Plaintiff's fear of lost credit opportunities and/or damage to her reputation is speculative or factually implausible. As the record reflects, Plaintiff's poor credit rating as reported by Equifax has already had adverse consequences in the recent past, and, as a matter of common sense, rational jurors might conclude it is likely to be harmful in the future unless changes, if warranted, are made to her credit report. Accordingly, the Court denies Defendant's Motion for Partial Summary Judgment on this ground as well.

*Miller v. Equifax Info. Servs., LLC*, 2012 U.S. Dist. LEXIS 168894, *7-8 (E.D. Ore. Nov. 28, 2012). The *Miller* case was tried, and the jury returned a $18,400,000 punitive damages verdict against Equifax.[4] Since a reasonably jury would find for Ms. Strohbehn on this topic, Access Group's motion should be denied.

**Harm to Existing Credit:**

Access Group's credit information caused a decrease to two lines of credit and the complete cancellation of another. These decreases and cancellation are tied, causally, to Access Group, as shown by the testimony of Mr. McConville. PPAMF ¶ 114. But for Access Group's reporting the false negative information to her credit and not removing the information post dispute, these financial harms would not have occurred. As such, Plaintiff has provided evidence (construed in her favor) that a reasonable jury could find in her favor on this issue of damage.

2. **Ms. Strohbehn has suffered lost time from work.**

Ms. Strohbehn was asked at her deposition if she had apportioned the hours of lost work between the two defendants. At that time, she had not, and neither defendant asked her to actually apportion lost hours between them. Now she has apportioned that time. She believes that she lost between 3-11 hours of time at her work between the January 2016 phone call and the filing of this case. *Id*. ¶ 117. She has lost additional time after the commencement of the lawsuit. *Id*. ¶ 118. She estimates this to be ten additional hours of work from the filing of the lawsuit to the date that she signed her declaration. *Id*. ¶ 119. Since she has proven actual loss, she should be allowed to present her lost time injury to the jury.

3. **Ms. Strohbehn has suffered from emotional distress.**

**Access Group does not follow the requirements under Fed. R. Civ. P. 56.**

---

[4] This number was reduced on appeal.

In making a Rule 56 motion, "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record … or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  Additionally, the local rules require "a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law."  Civil L.R. 56(b)(1)(C).  Access Group tries to argue that Plaintiff has no damages, then fails to cite to materials in the record or to proper proposed facts.

In attacking Ms. Strohbehn's emotional distress damages, Access Group only submits three proposed facts:

> *63. Since January 2016, Plaintiff has not sought any medical or psychological treatment as a result of any of Access Group's alleged conduct.*
>
> *64. Plaintiff was diagnosed with anxiety and depression in 1999 and has been treated with medications for those conditions ever since.*
>
> *65. Since January 2016, there been no increase in the dosage of the medication prescribed for Plaintiff's anxiety and depression.*

Dkt. 102.  All Access Group is able to establish with these facts is that Plaintiff has been on mediation for anxiety and depression, but she did not increase this medication or seek medical or psychological treatment as a result of the Defendant's conduct.  These facts do not establish that Ms. Strohbehn has no emotional distress damages resulting from Access Group's actions.  Rather, Access Group's tactic here is to simply issue a broad and conclusory statement that Plaintiff cannot ever prove that she suffered actual damages – because she didn't go to a doctor and was already on anxiety and depression medication.  Access Group shied away from asking Plaintiff deposition questions about her emotional distress damages.  PPAMF ¶ 124.  Now, in the face of its failure to conduct the necessary discovery, Access Group simply demands that

Plaintiff prove her case here and now. Access Group's noncompliance with the federal rules should result in denial of its summary judgment motion regarding emotional distress damages.

**Plaintiff has suffered emotional distress.**

The Seventh Circuit provides guidance related to emotional distress damages, instructing that the allowance of emotional distress claims is connected to an actual "loss" that the federal statute was designed to protect. *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) ("And, as we said earlier, if she could show that she had suffered a loss within the contemplation of section 362 [of the Bankruptcy Code], which is to say a financial loss, she might be permitted to piggyback a claim for damages for incidental emotional distress. But without such a showing, her claim must fail, and so her suit was rightly dismissed.").

So that begs the question, what types or categories of harm are contemplated by the FCRA? "A poor credit history is the 'Scarlet Letter' of 20th century America." 136 CONG. REC. H5325-02 (daily ed. July 23, 1990) (statement of Rep. Annunzio), 1990 WL 103877. For Ms. Strohbehn and every other American, "[t]he banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1). In addition to the collection calls, letters, and derogatory credit reporting, Ms. Strohbehn feared that Access Group was laying the groundwork to take the next (and fatal) step in damaging her reputation and finances: suing her for money. This backdrop (and the other actual damages discussed *supra*) supports her emotional distress claim.

The Seventh Circuit "require[s] that "when the injured party's own testimony is the only proof of emotional damages, she must explain the circumstances of her injury in <u>reasonable</u>

<u>detail</u>; she cannot rely on mere conclusory statements." *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 609 (7th Cir. 2005) (emphasis added) (citing *Sarver v. Experian Info. Solutions*, 390 F. 3d 969, 691 (7th Cir. 2004). Ms. Strohbehn claims several categories of actual damages here: emotional distress, embarrassment, helplessness, hopelessness, lost of sleep, frustration, anxiety, and fear. Given Access Group's failure to explore these damages in discovery, it will now find the record of evidence overwhelmingly against it. Even though Ms. Strohbehn should not be expected to compensate for Access Group's non-compliance with the rules regarding material facts, she will provide the "reasonable detail" necessary to show the Court that she did indeed suffer emotional distress.

Ms. Strohbehn is currently a partner at the law firm of Gimbel, Reilly, Guerin & Brown, LLP and has been at all times during this lawsuit. PPAMF ¶ 125. Each evening at her firm, all attorneys receive an email of all lawsuits filed in state and federal court. That emailed report is used by the firm in the normal course and scope of business. *Id*. ¶ 126. As a younger partner at a prestigious local firm, it would have jeopardized Ms. Strohbehn's reputation and career to have been sued in court for a debt she did not owe. *Id*. ¶ 127. It would have caused Ms. Strohbehn to suffer extreme embarrassment to explain to her colleagues, subordinates, and support staff, that she had been wrongfully sued. *Id*. ¶ 128. Ms. Strohbehn feared that if she was sued people would gossip behind her back, view her as a deadbeat, trust her less, and it would limit her ability to advance in her career. *Id*. ¶ 129. As a minority litigator, it is important to Ms. Strohbehn that she maintain her decorum and reputation both within her firm and with opposing attorneys. *Id*. ¶ 130. It would be extremely embarrassing for Ms. Strohbehn to be sued on an allegedly unpaid debt which would be assigned to a Milwaukee County Circuit Court judge. *Id*. ¶ 131. She has had cases with all judges on civil rotation in Milwaukee County, and is known

personally to many of them. *Id.* The tax lien which Access Group mentions is not available on CCAP, so this does not harm Plaintiff's reputation. *Id.* ¶ 123. Reputational damages have been explicitly recognized by courts, and are common form of damages sought by Plaintiffs. See *Williams v. First Advantage LNS Screening Solutions, Inc.*, 238 F. Supp. 3d 1333, 1339 (N.D. Fl. Mar 2, 2017) (denying motion for judgment as a matter of law in a FCRA case involving reputational damages and a $250,000 compensatory damages verdict and a $3,300,000 punitive damages verdict).

The threat of being wrongfully sued caused Ms. Strohbehn to become withdrawn and short-tempered with co-workers. PPAMF ¶ 132. She became less focused and more anxious about her professional reputation, causing her to be less patient with her support staff and to display agitation toward others. *Id.* She was embarrassed that Access Group contacted her father after this case had been pending for over a year. *Id.* ¶ 133. She had not told her father about this case, but Access Group's actions of contacting him required her to explain what was happening in her personal life. *Id.*

As a working mother and professional it is important to Ms. Strohbehn that she maintain structure and order. *Id.* ¶ 134. That order has allowed her to succeed personally and professionally. *Id.* When Access Group began to make collection calls and placed false information on her credit, Ms. Strohbehn felt helpless. *Id.* ¶ 135. This helplessness resulted in her losing time at work as she was forced to call Access Group, retain an attorney, send disputes to the credit reporting agencies, communicate with her lawyer, and engage in litigation. *Id.* ¶ 136. Ms. Strohbehn felt helpless because she was unable to protect her financial future and had to sue the Defendants in this case. *Id.* This feeling of helplessness manifested itself in this lawsuit, because Ms. Strohbehn felt she was unable to protect herself and her future without

relief from the judicial system.  *Id*. ¶ 137.

When she received letters from ACS in 2016, Ms. Strohbehn felt like she was going to throw up because they were going to ruin her financial and professional success.  *Id*. ¶ 138.  She could feel the frustration and helplessness take form in a gnawing feeling in her stomach.  *Id*.  The collection actions of Access Group her caused her to feel anxious.  That feeling manifested itself in shortness with others (as mentioned earlier), loss of focus at work (as mentioned earlier), and general irritability.  Ms. Strohbehn exhibited this anxiety, irritation, and frustration at work.  *Id*. ¶ 139.  A co-worker for over a decade observed her change in demeanor and attitude because of Access Group.  He observed her change in temperament, anxiety, irritability, and that something appeared to be weighing her down.  He stated that she seemed embarrassed about the collection actions that had been commenced against her and that she had to sue Access Group to get relief.  *Id*. ¶ 146.

When Ms. Strohbehn is anxious she suffers from loss of sleep.  *Id*. ¶ 140.  After being contacted by Access Group, she suffered from loss of sleep.  She would either not be able to fall asleep, or she would wake up in the middle of the night and not be able to fall back asleep.  This period of sleepless started in January 2016 and continued thereafter.  *Id*.  While no one was able to see her suffer from sleeplessness (her husband slept the entire time she was awake), her anxiety took the form of sleeplessness.  *Id*.  As a result of Access Group's collection actions toward her, Ms. Strohbehn felt fear and anger.  *Id*. ¶ 141.  This manifested itself in the sleeplessness and irritability towards co-workers described above.  *Id*.  She was also fearful and angry that Access Group would sue her husband for her supposed debts, and that this would ruin his reputation in the community[5] and amongst her law partners.  *Id*.

---

[5] Mr. Strohbehn is also a recognized civil litigator at the same law firm as Plaintiff.

Ms. Strohbehn states the continued and protracted litigation in this case has caused her to suffer continued embarrassment, helplessness, frustration, anxiety, sleeplessness, and fear, as described above. *Id*. at 145. Ms. Strohbehn had to retain lawyers and file a lawsuit to get the humiliating and harassing behavior to cease and is certainly evidence that Access Group's behavior was of the nature as to reasonably be expected to cause emotional distress. This Court is well aware of the "smallness" of the legal litigation community in Milwaukee, and that the prospect of being sued for any unpaid debt could reasonably cause a newly-minted law partner to live in dread and fear. Not only would the lawsuit harm her reputation with judges and colleagues, it would be emailed to her law partners as soon as it happened.

To prevent Access Group from adding to her reputational damage (because at this point they had called her father alleging a past-due bill, placed derogatory information to her credit, and sent her collection letters), Ms. Strohbehn sued Access Group in federal court to get them to stop bothering her. After this suit was commenced, Access Group turned up the heat and sent a collection lawyer to harass her. *Id*. ¶¶ 142-143. That collection firm violated the FDCPA, resulting in its inclusion into this suit. Since then, Access Group has stopped sending letters and hasn't even tried to bring a counter-claim against Ms. Strohbehn. *Id*. ¶ 143. It took a federal lawsuit to get Access Group to stop. A reasonable jury could hold in favor of Ms. Strohbehn based on the testimony in which she explained with reasonable detail her emotional distress. These facts show the details and circumstances of the emotional distress damages claimed by Ms. Strohbehn. These fears were real, imminent, tangible, and documented.

## IV.    ACCESS GROUP ACTED IN RECKLESS DISGRARD FOR MS. STROHBEHN'S RIGHTS.

"[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company

ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).[6] The standard is objective. Access Group does not have written polices regarding the statute of limitations in Wisconsin. PPAMF ¶ 115. ACS, in turn, just followed the direction of Access Group. *Id*. ¶ 108. Having ZERO policies to ensure compliance with the statute of limitations is sufficient evidence of a willful violation, because Access Group closed its eyes on compliance in connection with reporting loans on Wisconsin consumers. If a company has <u>no policies in connection with the statute of limitations</u> for Wisconsin residents, its risk of violating the statute of limitations (and trying to collect on non-existent debt) is infinitely higher than a careless reading of the statute of limitations. In fact, Access Group's attorneys are trying to re-write the Wisconsin statute of limitations by arguing that a debt survives after the statute has run. Dkt. 117, p. 9. This brazen approach shows Access Group not care about Wisconsin law in the past or now.

A failure to have <u>any</u> policy to ensure debts past the statute of limitations are not collected (or reported to credit) with a balance due is exactly the type of willful behavior that the FCRA is to protect against. Access Group cannot close its eyes when engaging in credit reporting and collection on Wisconsin loans. The failure of Access Group to have any policies on this topic hurts all Wisconsin consumers.[7] A reasonable jury could find the absence of a policy to ensure lawful collection was willful and reckless.

V. **PLAINTIFF'S WCA ACT CLAIMS INVOLVE 5 SEPARATE CREDIT TRANSACTIONS.**

---

[6] Access Group tried to bait Ms. Strohbehn into defining "willful" at her deposition. However, Ms. Strohbehn's understanding of the word does not change the fact that the Supreme Court has addressed how "willful" must be defined in the FCRA context.

[7] As of 2015, Access Group was collecting on $17,486,467.83 in consumer credit loans from Wisconsin consumers. PPAMF ¶ 116.

The parties agree that the Wisconsin Consumer Act ("WCA") only applies to transactions $25,000 and under and that each loan entered between the parties was less than $25,000. Plaintiff takes the position that since each individual loan was under $25,000 and each individual loan was a separate transaction, the WCA applies to all. Access Group argues that the Court should meld the separate transactions into one, bringing the total to over $60,000. Access Group's reliance on *Riverside Fin., Inc. v. Rogers*, No. 2013AP2388, 2015 WL 4578903 (Wis. Ct. App. July 31, 2015) is unfounded for two reasons. First, the consumer in *Riverside* argued that the individual loans were a single transaction. Second, in order for this Court to rely on a state appellate court decision, it must be shown that the highest state court would not disagree with the appellate decision. *West v. American Tel. & Tel. Co*., 311 U.S. 223, 237 (1940).

**a. Unlike the consumer in *Riverside*, Plaintiff has argued that her five loans are five, separate transactions.**

*Riverside* involved a consumer with twelve separate loans. *Riverside* at *1. The consumer argued that the twelve loans were one transaction. *Id*. at *8-9. ("Rogers reiterates his circuit court argument that all twelve loans issued by Riverside constitute a single transaction. Riverside agrees. We therefore assume, arguendo, there was a single transaction.") Ms. Strohbehn has never argued that the five student loans from Defendant Access were a single transaction, but rather she maintains that the five loans must be treated as five separate loans and five separate transactions. The *Riverside* decision "should not be considered an endorsement of th[e] position" that the Court's "acceptance of the parties' agreement that all twelve loans constituted a single transaction." *Id*. at *9. It was the consumer's choice to argue the twelve loans were a single transaction, and the *Riverside* Court could not "abandon [their] neutrality to develop arguments for the parties." *Id*. (citing *Industrial Risk Insurers v. American Eng'g Testing*, Inc., 2009 WI App 62, ¶25). Clearly the Court of Appeals realized that the consumer in *Riverside* missed the boat, but they had to rely

on the record they were given. This is not the record of Ms. Strohbehn's case. Ms. Strohbehn continues with her assertion that all her loans with Access were separate transactions.[8]

The WCA is to "be liberally construed and applied to promote [its] underlying purposes and policies." Wis. Stat. § 421.102(1). The purpose, in part, is "[t]o protect consumers against unfair, deceptive, false, misleading and unconscionable practices" and "[t]o permit and encourage the development of fair and economically sound consumer practices in consumer transactions." Wis. Stat. § 421.109(2)(b)-(c). Here, Ms. Strohbehn took out five separate loans at five separate times, constituting five separate transactions. Try as it might, Access Group can't get around the fact that not a single transaction with Plaintiff was over $25,000. The liberal construction of the WCA requires the motion of Access Group be denied.

**b. The Wisconsin Supreme Court would disregard the holding in *Riverside*.**

"Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West* at 237. The Wisconsin Supreme Court could not consider the holding in *Riverside*, because if this case was pending in front of the Wisconsin Supreme Court, no party would be able to cite to *Riverside*. See Wis. R. App. P. 809.23(3). As an unpublished *per curium* decision, *Riverside* cannot be cited as the law of Wisconsin; it is not even persuasive authority on the issue cited.[9] This is underscored by the fact that the Court of Appeals themselves specifically warned that their decision was not an endorsement of the theory that multiple

---

[8] "'Transaction' means an agreement between 2 or more persons, whether or not the agreement is a contract enforceable by action, and includes the making of and the performance pursuant to that agreement." Wis. Stat. § 421.301(44).

[9] While Access Group should have known that *Riverside* was an unpublished *per curium* decision before it first quoted it on dismissal, Dkt. 33, Plaintiff specifically brought this to Access Group's attention in her sur-reply, Dkt. 35.

individual loans combine into one transaction, but rather they were required to apply the law to the facts that they had been presented. *Riverside* at *9.

## VI. ACCESS GROUP'S COLLECTION ACTIONS WERE HARASSING.

Ms. Strohbehn previously staked out her Wis. Stat. § 427.104(1)(h)[10] claim at the dismissal stage. MTD Order, Dkt. 40, p.10-11. Plaintiff has proposed sufficient facts that a reasonable jury could find in her favor, as the harassing nature of the collection actions are based on the fact that Access Group was collecting on a debt that did not exist. This court is to apply an objective standard and ask: would the conduct of Access Group in attempting to collect a non-existent debt reasonably harass a person in Plaintiff's position and career? *Associates Financial Services Co. v. Hornik*, 114 Wis. 2d 163, 167-168 (Wis. Ct. App. June 21, 1983).

Access Group uses a *pro se* case from a serial litigant[11] and compares it to Ms. Strohbehn's case for the proposition that its conduct could not be deemed harassing. *Andersen v. State Collection Serv.*, 2012 Wisc. App. LEXIS 743 (Wis. Ct. App. Sept. 12, 2012). To support his claim that the actions of the debt collector were harassing, Mr. Andersen provided only the following, "because the debt collector unilaterally dismissed the consumer's dispute request and request to be able to send a letter of dispute in order to try and get the consumer to pay a bill he just clearly stated that he had already paid." *Id*. at *9. Based on this one sentence explanation of harassment, the Court found "that no reasonable jury could conclude that State Collection Service harassed Andersen." The record shows that Ms. Strohbehn retained counsel to ask

---

[10] Plaintiff is withdrawing her Wis. Stat. § 427.104(1)(h) claim only to the extent there is a claim regarding credit reporting.

[11] This Court has been exposed to Mr. Andersen's litigation strategies in *Andersen v. Harris & Harris, LTD*., 2014 U.S. Dist. LEXIS 54953 (E.D. Wis. April 21, 2014). See also *Andersen v. Monco Law Offices*, 2012 Wisc. App. LEXIS 614 (Wis. Ct. App. Aug. 1, 2012) (Andersen sanctioned for failing to comply with a court order and case dismissed with prejudice); *Andersen v. Vavreck*, 2017 U.S. Dist. LEXIS 23851 (E.D. Wis. February 21, 2017) (dismissing malpractice claim against his former attorneys).

Access Group to cease their collection efforts; and that Access Group wouldn't even bother to have someone from their legal department contact her attorney. She talked to collection employees on the phone and was subjected to the actions of a debt collector hired by Access Group. She experienced a decrease to her credit score and lines of credit, lost out on the ability to borrow, and experienced detailed emotional distress. Not only are these compensable damages under the WCA, the Plaintiff is held to a different standard for emotional distress damages under the WCA. See Wis. Stat. §427.105(1) ("notwithstanding any other law actual damages shall include damages caused by emotional distress or mental anguish with or without accompanying physical injury proximately caused by a violation of this chapter."). Access Group has stated there is no universe in which its conduct could be harassing, and Ms. Strohbehn has rebutted that position (through this entire brief, not just this section) by showing that Access Group persisted in its collection activities. As such, this issue must proceed to a jury.

Access Group argues that under *Footville State Bank v. Harvell*, 146 Wis. 2d 524 (Wis. Ct. App. 1988) Ms. Strohbehn isn't entitled to damages under Wis. Stat. § 425.302(1)(b). However, Access Group attempts to mislead the Court in its analysis, as Ms. Strohbehn has only sought damages under § 425.<u>304</u> as allowed for the type of violation of §427 plead. The analysis of the *Harvell* Court relates to damages under Wis. Stat. § 425.<u>302</u>(1)(b) and that for a consumer to recover actual damage, they must have actual damages. The court should discard this argument as damages under § 425.302(1)(b) are not sought by Ms. Strohbehn.

Ms. Strohbehn has already explained the damages that she has suffered in detail *supra*. A reasonable jury could return a verdict for Ms. Strohbehn on the issue of actual damages, including emotional distress. As such, the Court should deny Access Group's Motion for Summary Judgment.

## VII. THE RECORD SHOWS THAT ACCESS GROUP'S RECORDS ARE NOT ACCURATE.

Access Group asks the Court to accept its records as the gospel truth. One of its favorite quotes throughout this case has been "[t]aken as true, the Account Documents appear to destroy the foundational allegations of Strohbehn's amended complaint—that Access has been attempting to collect non-existent debts." MTD Order, Dkt. 40, p. 4. Access Group believes it "has adduced overwhelming evidence that all of the information that it maintained and reported regarding Plaintiff… was accurate." SJ Brief, Dkt. 101, p. 13-14. But Access Group's so-called "overwhelming evidence" is based on the parroting of its faulty records. Evidence has shown that Access Group's records are not actually accurate.

### A. Access Group's evidence is all based on one company's accounting.

KHESLC was Access Group's servicer that applied the $68,051 payment in April 2007. KHESLC had policies regarding how to apply payments, but it was not sure how payments were applied across all five of the loans. PPAMF ¶¶ 70-71. The mathematical calculates offered by KHESLC did not actually line up with when it determined the next payment was due. *Id*. ¶ 72. Access Group simply took KHESLC's accounting and accepted it as its own, reporting the information to Ms. Strohbehn's credit. *Id*. ¶¶ 73-74. Then Access Group gave the information to ACS when ACS was hired to assist with the management of the loans. *Id*. ¶ 75. ACS then treated the accounting as if it were correct. *Id*. ¶ 76. Instead of "overwhelming evidence" all Access Group has is proof that all companies have been using the same tainted data. Evidence shows Ms. Strohbehn paid $68,051 on her Access Group loans, because that is how much she was told that she owed at the time of payment. *Id*. ¶¶ 77-78. It was not until 2016 that Ms. Strohbehn had actual knowledge that Access Group alleged she owed additional funds. *Id*. ¶ 79.

### B. Access Group's records are sloppy at best.

Access Group cannot prove chain of title on two of the three loans that it claims are still due and owing, as the loans were funded by National City Bank and Access Group provided information regarding U.S. Bank. *Id*. ¶ 80. Access Group provided a TILA disclosure to Ms. Strohbehn that stated after 48 consecutive payments she would have received a .5% reduction in interest. Using Access Group's "advance the interest" theory, Access Group did not provide the reduction after receiving 48 consecutive payments. *Id*. ¶ 81. Access Group reported that Ms. Strohbehn was making $530 monthly payments on her alleged outstanding loans, but this amount is not supported by any math and as such is a fictional payment. *Id*. ¶ 82. Access Group has policies regarding sending monthly statement, but it did not record these statements or follow its own policies. *Id*. ¶ 83. In short, Access Group's records cannot be trusted

**C. Access Group's accounting is not supported by the underlying contracts.**

Access Group agrees that the contracts are silent regarding "advancing the due date." While the "advance the payment" policy provides more interest to Access Group, *Id*. ¶ 84, the contracts between the parties must be followed. KHESLC did not tell Ms. Strohbehn it would advance the due date As argued *supra*, the contracts are not ambiguous and should be followed.

**CONCLUSION**

Ms. Strohbehn has met her burden to show that when the facts of this case are viewed in a light most favorable to her, a reasonable jury would return a Plaintiff's verdict. Plaintiff requests that the Court deny Access Group's motion for summary judgment.

Respectfully submitted this 2[st] day of October, 2017.

DeLadurantey Law Office, LLC

s/ Nathan E. DeLadurantey
Nathan E. DeLadurantey (WI# 1063937)
Heidi N. Miller (WI# 1087696)
330 S. Executive Drive, Suite 109
Brookfield, WI 53005
(414) 377-0515; (414) 755-0860 – Fax
Nathan@dela-law.com
Heidi@dela-law.com